NOT DESIGNATED FOR PUBLICATION

No. 114,544

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TRISTAN MILES,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE BROWN, judge. Opinion filed January 27, 2017. Affirmed in part, reversed in part, and remanded with directions.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before MALONE, C.J., GREEN and LEBEN, JJ.


*Per Curiam*:  Tristan Miles was convicted in a nonjury trial of possession of marijuana with the intent to distribute, possession of paraphernalia with the intent to distribute, proceeds derived from violations of drug laws, and failing to maintain a single lane of traffic. Miles raises three issues on his direct appeal: (1) whether the officer who stopped his car had reasonable suspicion that Miles had committed a traffic infraction that justified his seizure; (2) whether the later search of his car was illegal because no exceptions to the warrant requirement existed; and (3) whether his consent to search his car was so tainted by the actions of the officer—reaching into Miles' car and retrieving

1

alleged marijuana crumbs from the passenger seat of Miles' car without his consent—that it rendered his later consent involuntary. Finding merit in Miles' second and third issues, we affirm in part, reverse in part, and remand with directions to grant Miles' motion to suppress all seized evidence gathered as a result of the search of his car.

On March 12, 2014, Miles was charged with the following:

1. One count of possession of marijuana with the intent to distribute under K.S.A. 2012 Supp. 21-5705(a)(4)(d)(2)(A);
2. One count of possession of paraphernalia to distribute or manufacture under K.S.A. 2012 Supp. 21-5709(b)(1)(e)(2)(A);
3. One count of maintaining an interest in proceeds derived from violations of drug laws under K.S.A. 2012 Supp. 21-5716(b)(e)(1); and
4. One count of failing to maintain a single lane under K.S.A. 8-1522(a).

Miles later moved to quash his traffic stop and to suppress all evidence gathered as a result of the search of his car. Miles argued that because his traffic stop was not valid, it resulted in an illegal search of his car. The trial court held a hearing on this motion and denied Miles' motion. In denying the motion, the trial court found that the stop was valid, that probable cause existed to conduct a search of his car, and that Miles had voluntarily consented to a search of his car.

Miles waived both his right to a preliminary hearing and his right to a jury trial. He agreed to a bench trial on stipulated facts. At the bench trial, Miles' counsel renewed his objection to the legality of the car search. The trial was conducted on the following stipulated facts:

"The following events occurred in Wichita, Sedgwick County, Kansas. On February 8th, 2014, at approximately 2225 hours [a police officer] stopped a white Dodge Charger . . .

2

at 2400 N. I-135 for failing to maintain a single lane by crossing over the dashed white line with more than half of his vehicle while in I-135. [The officer] contacted the driver, Tristan Miles who told him he had been washing his windshield and could not see. While speaking with him, [the officer] could see marijuana crumbs on the front passenger seat and could smell an overwhelming odor of air freshener coming from the vehicle.

"[The officer] told Mr. Miles he could see the marijuana crumbs and asked him if he could search the vehicle. Mr. Miles told him he could search it. During a search of the vehicle [the officer] recovered the marijuana from the front seat and an intact bud from the center console cup holder and $220.00 U.S. Currency from the center console. While searching the trunk he located a back pack containing two baggies of marijuana, a box of sandwich baggies, and a digital scale with marijuana residue on it.

"After being advised of his rights, Tristan Miles agreed to speak with [the officer]. He admitted to selling the marijuana, but said he does not smoke it. He said it was his first time selling marijuana. He said he needed to raise money for a down payment since he was just in a [car] wreck.

"[The officer] field tested the marijuana and it tested positive for the presence of THC. The marijuana was later confirmed as marijuana, containing tetrahydrocannabinol, through the Sedgwick County Regional Forensic Science Center . . . in the amount of 31.93 grams.

"Additionally, the parties incorporate the record and findings of fact placed on the record during the Defendant's Motion to Suppress held on January 26, 2015 . . . . Defendant's [*sic*] maintains an ongoing objection to those findings for purposes of appeal."

Many of the stipulated facts were derived from testimony given at Miles' motion to suppress hearing. Because the facts introduced at that hearing adds clarity to what occurred leading to the traffic stop and to the search of Miles' car, we include those facts:

Miles' car was stopped on February 8, 2014, around 10:25 p.m. The officer who stopped Miles was working highway interdiction. Highway interdiction includes "seeking

3

out criminals of any type, whether it's drugs, wanted suspects of any other crime, stolen vehicles . . . while enforcing the State and the city's traffic ordinances and laws." The officer identified Miles at trial as the individual he stopped on February 8, 2014. In 2014, the officer was a 9-year veteran of the Wichita Police Department. The officer was assigned to the SCAT team, whose mission was "to enforce drug crimes, violent crimes, [and] gang-related crimes." Before working with the Wichita Police Department the officer had been a military policeman in the Army for 9 years.

On the date of the stop, the officer was monitoring traffic on Interstate 135 while parked in the interstate's median. Though it had recently snowed in the area, the roads were "relatively clear and dry." The officer did not notice any ice on the road. The officer had his car's headlights on so that passing drivers could see him. Moreover, his car's headlights allowed him to see the passing traffic. As Miles drove past the officer, the officer saw Miles duck down in his car, "like a turtle sucking his head into a shell." Based on his training, the officer took that to mean Miles was nervous. Miles was not speeding and had not committed any other violation of law when the officer first saw him. The officer then drove his car onto the highway to monitor Miles' driving.

There was not much traffic on the interstate then. It took the officer about 30 seconds to catch up to Miles' car. Miles was driving in the center lane of the interstate. Miles' car began to drift into the left lane. The officer could see both the front and rear wheels on the driver's side of the car cross over the line marking the lane. The officer saw more than half of Miles' car drift over the line. The officer "actually believed [that Miles] was changing lanes and just had failed to signal that lane change," but Miles corrected the car back into the center lane. The officer could see the violation "plain as day." The officer did not see any obstruction or hazard on the interstate that would explain Miles' movements. The officer considered the possibility that Miles was drunk, too tired to drive, or engaged in some other activity distracting his attention away from the road.

4

The officer was wearing a body camera while he followed Miles. The officer's body camera was not activated, however, until after the traffic violation had occurred. The officer turned on his emergency lights. Miles moved his car to the right-hand shoulder. When an officer notifies dispatch that he or she is making a nighttime stop, a backup unit is automatically dispatched to the location of the stop. The officer notified dispatch that he was pulling Miles over.

The officer walked up to Miles' car on the passenger side so that he was not standing on the side of passing traffic. Had the officer gone to the driver's side of Miles' car, he would have had to stand in the right-hand lane of the interstate. The officer initially thought he was dealing with a drunk driver. The officer explained to Miles why he had stopped him. Miles told the officer that he had drifted into the other lane because he was washing his windshield. Miles did not dispute that he had drifted into the other lane.

The officer asked Miles for his driver's license and proof of insurance. Miles explained to the officer that he was driving a rental car because he had recently been in a car accident. While the officer was speaking to Miles, he had his flashlight aimed at the interior of the car. The officer could see what appeared to be marijuana crumbs on the front passenger seat. The officer could see one alleged marijuana crumb for sure. The officer was scanning the interior of the car for weapons or drugs in plain view when he spotted what he believed were marijuana crumbs. The officer saw the alleged marijuana crumbs while Miles was searching for the documentation that the officer had requested. The officer admitted that the beam from his flashlight made it difficult to see the small crumbs.

As Miles explained to the officer that the car was a rental, Miles gave the officer the rental agreement. The officer noticed that the return date for the car had passed. Miles told the officer that his insurance company told him that the return date for the car was

5

not yet due. The officer accepted Miles' explanation based on his own experience with insurance companies and rental cars. He also accepted Miles' explanation because dispatch told him that the vehicle had not been reported embezzled or stolen. As the officer was discussing the rental agreement with Miles, he reached into the car and placed the rental agreement on the passenger seat. The officer placed the agreement on the seat so that Miles would not see the alleged marijuana crumbs. The officer also placed the agreement over the alleged marijuana to quell any fight or flight response Miles may have were he to realize what the officer had seen.

During his initial conversation with Miles, the officer could smell a very strong odor of air fresheners. The officer testified that it was not uncommon for people to have air fresheners in their cars. The officer believed it was unusual, however, for an individual to buy air fresheners for a rental car. The officer also identified two phones in Miles' car. One of the phones was in the cup holder next to the driver. The other phone was plugged into a charging cord near the floorboard of the car. Miles informed the officer that he was planning on fixing one of the phones and giving it to his girlfriend. The officer also saw a bottle of cologne in the center console of the car when Miles opened it to find his rental agreement. The officer testified that cologne is often used to mask the odor of marijuana. Cologne would not normally raise any red flags for the officer.

After the officer saw the alleged marijuana on the passenger seat, the officer went back to his car to check Miles' license. The officer wanted to minimize the situation, so he told Miles that he would likely give him a warning. Miles did not have any warrants, and his license was in good standing. As the officer was checking Miles' license in his patrol car, he narrated his body camera footage. The officer made the following statements:

"Alright. I can see what appears to be marijuana buds on the front passenger seat. He's got two cell phones. I tried not to bring attention to the marijuana. I actually tried to use the rental agreement to cover it up, what I could see. So, I'm gonna wait for my backup to get here. Take it from there."

The officer was waiting for his backup to arrive before he conducted a search of Miles' car based on the alleged marijuana that he had seen on the passenger seat. The officer then got out of his patrol car and asked Miles to step out of his car because he wanted to talk with him.

The officer told Miles about the alleged marijuana crumbs that he had seen on the passenger seat. The officer took Miles to the passenger window and showed him the alleged crumbs. The officer testified that he asked Miles for permission to retrieve one of the crumbs. On the body camera video, however, the officer tells Miles, "I'm gonna pick that little chunk up right there and look at it. Okay?" The officer directed Miles to stand at the back of his car. The officer then retrieved the alleged marijuana crumbs from the passenger seat. The officer admitted that he did not have consent to search the car before he reached in and retrieved the marijuana crumb. After retrieving one of the alleged marijuana crumbs and manipulating it with his fingers, the officer said, "Man, I tell ya. It's kinda hard to tell. It's definitely green and flaky. Weed comes in all shapes and sizes." The piece that the officer manipulated with his fingers flaked away into the air. The officer did not preserve the alleged marijuana crumb for evidence.

After the officer showed Miles the alleged marijuana crumbs, the officer asked Miles if he could search the car. The audio from the body camera footage indicates the officer told Miles: "You don't have to say yes, you absolutely have the right to say no. But is it alright if I search the car real quick to make sure that that's not weed that I'm looking at?" The officer testified that Miles said something like "[s]ure; go ahead, or

7

[y]ou can search it; go ahead." The audio from the body camera footage indicates Miles said something that cannot be determined followed by, "yeah, sure."

The officer believed he had probable cause to search Miles' car after he saw the alleged marijuana. The officer asked for consent because he thought doing so would build the objectivity. The officer also believed that asking for consent would put Miles at ease. A guide to the officer's reasoning follows: "It's also making sure that I've got all my T's crossed; not only can I see what I've been trained to know what marijuana looks like, but I have also gotten permission from the occupant or the person who has responsibility over the car, to search it."

The officer's backup had still not arrived when he asked Miles for consent to search the car. The officer testified that it would have been dangerous to search the car without backup. The officer did not place Miles in his car because there was a police dog in the back seat. The officer did not use his trained dog during the stop because he believed he had already established probable cause. The officer testified that his dog is there to help him "establish probable cause, absent already existing probable cause."

While the officer waited for backup, he allowed Miles to make a phone call. The officer stood near him to monitor his actions. It took about 1-2 minutes for backup to arrive after the officer asked Miles for his consent to search the vehicle. Two backup officers arrived. Both patrol cars had their emergency lights on. The two backup officers stood with Miles as the officer searched the car. The searching officer "recovered the marijuana from the front seat and an intact bud from the center console cup holder and $220.00 U.S. Currency from the center console. While searching the trunk [the officer] located a back pack containing two baggies of marijuana, a box of sandwich baggies, and a digital scale with marijuana residue on it." Miles was placed under arrest. Miles then made post-*Miranda* incriminating statements.

8

At the bench trial Miles was found guilty of possession of marijuana with intent to distribute, possession of paraphernalia with intent to distribute, proceeds derived from violations of drug laws, and failure to maintain a single lane of traffic. Miles was sentenced to 18 months' probation with an underlying prison sentence of 15 months and 24 months of postrelease supervision. Miles was also fined $50 for the traffic violation of failing to maintain a single lane under K.S.A. 8-1522(a). At his sentencing hearing, Miles renewed his argument challenging the denial of his motion to quash traffic stop and to suppress evidence.

*Did the Trial Court Err in Denying Miles' Motion to Quash Traffic Stop?*

This court applies a bifurcated standard of review when reviewing a trial court's decision on a motion to suppress. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016). First, this court determines whether the trial court's findings are supported by substantial competent evidence. *Patterson*, 304 Kan. at 274. Substantial evidence means legal and relevant evidence that could be accepted by a reasonable person as adequate to support a conclusion. *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015). This court will not reweigh the evidence or the credibility of witnesses and will not resolve any conflicting evidence. *Patterson*, 304 Kan. at 274. Next, this court reviews the trial court's legal conclusions relating to the suppression of evidence using a de novo standard of review. *Patterson*, 304 Kan. at 274. "If the material facts in a trial court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review. [Citation omitted.]" *Patterson*, 304 Kan. at 274.

Miles argues that his traffic stop was not supported by reasonable suspicion. Miles also argues that the search of his vehicle was illegal because no exception to the warrant requirement of the Fourth Amendment to the United States Constitution existed when the search occurred. Here, the material facts in the trial court's decision are not in dispute.

9

Thus, we will employ unlimited review in considering Miles' motion to suppress. We will take Miles' arguments in turn.

a. *Was the traffic stop supported by reasonable suspicion?*

"[W]hen a law enforcement officer displays authority and restrains an individual's liberty by stopping a vehicle on a public roadway, constitutional issues arise because a seizure occurs within the meaning of the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights, both of which protect individuals against unreasonable searches and seizures. [Citations omitted.]" *State v. Jones*, 300 Kan. 630, 637, 333 P.3d 886 (2014).

A law enforcement officer's seizure of an individual is not constitutionally reasonable unless the officer knows specific and articulable facts that create reasonable suspicion that the individual is committing, has committed, or is about to commit a crime or traffic violation. See K.S.A. 22-2402(1) ("Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime."); *Jones*, 300 Kan. at 637. If an individual who has been seized by law enforcement moves to suppress because he or she believes this standard has not been met, it is the State's burden to establish the reasonableness of the seizure. *Jones*, 300 Kan. at 637. The State may generally meet this burden by presenting the law enforcement officer's testimony that he or she witnessed the individual commit a traffic violation before effecting the stop. *Jones*, 300 Kan. at 637. An officer's observation and testimony is sufficient because a traffic violation provides an officer with an objectively valid reason to make a stop. *Jones*, 300 Kan. at 637.

Miles was stopped for failing to maintain a single lane under K.S.A. 8-1522(a). The lane line that Miles crossed over was a dashed line and not a solid double line. K.S.A. 8-1522(a) mandates that "[a] vehicle shall be driven as nearly as practicable

entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." In using "as nearly as practicable," the statute "contradicts the notion that any and all intrusions upon the marker lines of the chosen travel lane constitute a violation." *Marx*, 289 Kan. at 674. To support a finding of reasonable suspicion under K.S.A. 8-1522, "a detaining officer must articulate something more than an observation of one instance of a momentary lane breach." *Marx*, 289 Kan. at 675-76. A violation of K.S.A. 8-1522(a) does not require a showing that the driver's actions were unsafe. *Marx*, 289 Kan. at 673. It does require, however, a showing that an officer witnessed more than an "incidental and minimal lane breach." *Marx*, 289 Kan. at 674.

Miles does not dispute that he crossed over the lane line. Instead, Miles argues that the "single momentary lane breach did not provide [the officer] with reasonable suspicion to make the traffic stop that led to [his] arrest." The question before us, then, is whether the officer articulated that what he witnessed amounted to something more than an "incidental and minimal lane breach." *Marx*, 289 Kan. at 674.

In *Marx*, an officer witnessed a vehicle cross over the line separating the highway from the shoulder and then overcorrect and cross the middle lane line. The court noted that "the defendant's vehicle was not weaving back and forth time and time again, but rather the deputy only observed one instance where the motor home did not maintain a single lane." *Marx*, 289 Kan. at 675. Our Supreme Court held that the State had failed to carry its burden of showing that the officer had an objectively reasonable belief that a traffic violation had occurred. *Marx*, 289 Kan. at 676. The court ultimately took issue with the evidence, or lack thereof, that the State presented. *Marx*, 289 Kan. at 675-76. The court found that the State did not offer testimony of the following: (1) the distance the vehicle crossed the lane lines; (2) the weather conditions; or (3) the practicability of maintaining a single lane when the alleged infraction occurred. *Marx*, 289 Kan. at 675-

11

76. Thus, the court held that the record did not support a finding that the officer had reasonable suspicion that the vehicle violated K.S.A. 8-1522(a). *Marx*, 289 Kan. at 676.

Turning our attention to the facts of this case, we note that for the officer to have reasonable suspicion that Miles had violated K.S.A. 8-1522(a) hinges on the following: whether Miles' actions constituted more than an "incidental and minimal lane breach." *Marx*, 289 Kan. at 674. Since *Marx* was decided, this court has taken up this question on multiple occasions. The results of the inquiries have been mixed. Further, our research has revealed no published Kansas cases citing *Marx* as authority. Thus, under Supreme Court Rule 7.04(g)(2), our post-*Marx* opinions have no precedential value. Supreme Court Rule 7.04(g)(2) (2015 Kan. Ct. R. Annot. 64). Still, unpublished opinions can offer guidance if the case "has persuasive value with respect to a material issue not addressed in a published opinion of a Kansas appellate court [and] . . . would assist the court in disposition of the issue." Supreme Court Rule 7.04(g)(2) (2015 Kan. Ct. R. Annot. 65).

Miles offers *State v. Eisenhauer*, No. 103,951, 2011 WL 767862 (Kan. App. 2011) (unpublished opinion), to support his argument that his "single momentary lane breach did not provide [the officer] with reasonable suspicion to make the traffic stop." In *Eisenhauer*, an officer witnessed a

> "truck trave[l] for several seconds straddling the westbound lanes with its driver's side tires in the left lane. The truck then 'drifted' back into the right lane and continued drifting close to, though not striking, the curb. The truck then 'drifted' to the left again but did not cross the lane marking, back to the right, and again to the left within the lane." *Eisenhauer*, 2011 WL 767862, at *1.

This court found that if it disregarded the driver's single, brief lane breach, it could not find support in the record to justify the stop. *Eisenhauer*, 2011 WL 767862, at *4. In arriving at its holding, the *Eisenhauer* court seemed to rely on the evidence, or lack of

12

evidence, presented. *Eisenhauer*, 2011 WL 767862, at *1-4. In that respect, *Eisenhauer* was similar to *Marx*.

In contrast, this court found an officer had reasonable suspicion to stop a driver when the officer witnessed the driver cross over the edge of the line separating the highway from the shoulder three separate times. See *State v. Neuman*, No. 112,933, 2015 WL 5311263 (Kan. App. 2015) (unpublished opinion). Furthermore, this court often finds sufficient evidence to support a finding that K.S.A. 8-1522(a) has been violated when an officer observes multiple lane breaches over several miles. See *State v. McGregor*, No. 107,855, 2013 WL 1010590 (Kan. App. 2013) (unpublished opinion) (reasonable suspicion to stop when car's tires touched or traveled atop lane line two or three times in a stretch of 3 miles where road was clearly marked and officer testified no reason driver should not have maintained lane); see also *State v. Sullivan*, No. 104,343, 2011 WL 3795480 (Kan. App. 2011) (officer witnessed driver fail to maintain lane multiple times over course of several miles and officer testified nothing prevented driver from maintaining lane). We note, however, that *McGregor* and *Sullivan* were examining whether sufficient evidence existed to support a finding that K.S.A. 8-1522(a) had been violated, not whether reasonable suspicion to make a stop existed. Still, these decisions are beneficial in understanding the types of actions this court has deemed to be violations of K.S.A. 8-1522(a). Understanding what constitutes a violation allows this court to determine whether the officer here was reasonable in believing the statute had been violated.

Unfortunately, we do not have the benefit of reviewing the alleged traffic violation on video because the officer did not turn on his camera until after the alleged violation had occurred. In the absence of a video, a trial court will rely on an officer's testimony. See *State v. Westfahl*, No. 106,692, 2012 WL 5392119 (Kan. App. 2012) (unpublished opinion) (where video of alleged traffic violation was inconclusive trial court used officer's testimony to determine lane had been breached).

13

Here, the officer witnessed Miles cross the line once and watched him return his car into its original lane. The officer saw both tires on the driver's side of Miles' car pass over the lane line. Also, about half of Miles' car drifted over the line. The car crossed over the line to such a degree that the officer believed that Miles may have failed to signal a lane change. The officer believed that Miles had violated Kansas law by either failing to signal a lane change or failing to stay in his lane for no apparent reason.

Miles emphasizes the fact that the officer only saw Miles' car breach the lane line once. But Miles' argument ignores the magnitude of the lane breach. Our Supreme Court in *Marx* expressly held that "a violation of K.S.A. 8-1522(a) requires more than an incidental and minimal lane breach." *Marx*, 289 Kan. at 674. While some cases, like *Neuman*, *McGregor*, and *Sullivan*, focus on the number of lane breaches, it is clear from the holding in *Marx* that the total number of breaches is not the only determinative factor in considering whether a lane violation has occurred. Instead, this court must determine whether an alleged lane breach was more than "incidental and minimal." Making that determination necessarily requires a court to consider the magnitude of the alleged breach. See *Marx*, 289 Kan. at 675. Here, the officer clearly testified as to the magnitude of Miles' lane breach. Thus, it would run counter to reason to simply rely on the fact that the breach occurred only one time. Moreover, this reliance would be inconsistent with the holding in *Marx*.

Furthermore, there were no obstructions in the road that would have prevented Miles from maintaining his lane of traffic. Although it had recently snowed in the area, the roads were relatively clear and dry when the stop occurred. The officer did not see any patches of ice on the interstate. There was also little traffic around Miles. After the stop, Miles told the officer that he had moved into the other lane because he had been washing his windshield and could not see. Miles did not dispute that he had crossed the line. Those facts were developed from the officer's testimony during Miles' motion to suppress hearing.

14

As a result, Miles' reliance on *Marx* is misplaced. The facts in this case are out of step with the facts in *Marx*. Here, the officer articulated something more than the officer in *Marx*. From the officer's testimony we know the following: (1) the magnitude of the lane breach; (2) the weather conditions on the night of the stop; and (3) the practicability of maintaining a single lane of traffic on the night of the stop. Even though the officer witnessed only one lane breach, the magnitude and the degree of the lane breach was more than "incidental and minimal." Also, the State provided ample evidence through the officer's testimony that the road conditions and surrounding circumstances were such that it would have been practicable for Miles to maintain his lane of traffic. Thus, the officer's stop of Miles was supported by reasonable suspicion that Miles had violated K.S.A. 8-1522(a) in failing to maintain his lane of traffic as nearly as practicable.

### b. *Was the search of Miles' car legal?*

Both the federal and the Kansas constitutions protect citizens against unreasonable searches and seizures. *State v. Stevenson*, 299 Kan. 53, 58, 321 P.3d 754 (2014). Warrantless searches are per se unreasonable under the Fourth Amendment to the United States Constitution unless an exception to the warrant requirement exists. *Stevenson*, 299 Kan. at 58. The exceptions to the warrant requirement include the following: (1) consent; (2) search incident to a lawful arrest; (3) stop and frisk; (4) probable cause plus exigent circumstances; (5) the emergency doctrine; (6) inventory searches; (7) plain view, feel, or smell; and (8) administrative searches of closely regulated businesses. *State v. Sanchez-Laredo*, 294 Kan. 50, 55, 272 P.3d 34 (2012).

The State and Miles both agree that the only exceptions in dispute are probable cause plus exigent circumstances based on the automobile exception, plain view, and consent. The first two exceptions hinge on whether probable cause was established. Thus, those two exceptions will be analyzed first under the same heading.

15

*Was Probable Cause to Search Miles' Vehicle Established?*

One subclass of the probable cause plus exigent circumstances exception is commonly referred to as the automobile exception. *Stevenson*, 299 Kan. at 58. If probable cause exists to believe a vehicle contains contraband or evidence of a crime, the Fourth Amendment to the United States Constitution does not require the police to obtain a warrant to search the vehicle if it is readily mobile. *Stevenson*, 299 Kan. at 58. Probable cause to search a vehicle is "established if the totality of the circumstances indicates there is a 'fair probability' that the vehicle contains contraband or evidence [of a crime]. [Citations omitted.]" *Stevenson*, 299 Kan. at 64.

Here, Miles was in the vehicle with the engine running when he was initially stopped. Thus, the vehicle was readily mobile and our only question is whether the officer had probable cause to search. See *Stevenson*, 299 Kan. at 58. The trial court relied on the officer's experience, the odor of the air fresheners, and the overdue car rental, as indicators of probable cause. The trial court also found that the cologne provided some additional minimal support for the purpose of probable cause. The trial court found, however, that "the probable cause issue revolve[d] around the visual observations in *plain view* of the marijuana buds." (Emphasis added.)

Miles now argues that the officer's "observations of legal, commonplace items in the car was insufficient to create the probable cause needed to extend the traffic stop into a full search of the car." Based on the trial court's findings, we will focus our inquiry on the cologne and the status of the rental agreement found in Miles' car.

The odor of a legal substance emanating from a vehicle does not give an officer probable cause to search the vehicle, even absent a legitimate explanation of the odor by the driver. *State v. Ibarra*, 282 Kan. 530, Syl. ¶ 3, 147 P.3d 842 (2006). In *Ibarra*, our Supreme Court noted that "[t]he strong odor of ether emanating from a house or a vehicle

16

is as consistent with lawful activity as it is with criminal activity . . . [and] the smell of ether alone is justification for further investigation but not for a search." *Ibarra*, 282 Kan. at 543. Our Supreme Court has also held "that a 'masking agent,' despite having legitimate retail purposes, may also be used to conceal drugs. . . . The weight assigned to the odor, however, varies with the circumstances. [Citations omitted.]" *State v. Moore*, 283 Kan. 344, 358, 154 P.3d 1 (2007).

Here, it cannot be said that the odor of an air freshener in a car is as consistent with criminal activity as it is with lawful activity, which distinguishes the air freshener from the odor of ether in *Ibarra*. In fact, the officer here acknowledged that it is not at all uncommon for people to have air fresheners in their cars. The officer stated that the air fresheners were only suspicious because they were in a rental car. Yet, despite the officer's suspicions, and as would have been permitted by *Ibarra*, the officer failed to investigate the origin of the air fresheners. As the car was a rental and no testimony on the origin of the air fresheners was heard, we cannot even say that the air fresheners belonged to Miles. For these reasons, the odor of air fresheners does not weigh heavily on the probable cause determination.

Similarly, the presence of a bottle of cologne in the car's center console does not weigh heavily on the probable cause determination. When paired with traffic violations, an individual fumbling with his wallet, droopy eyes, and slurred speech, the strong odor of cologne has been considered, based on an officer's experience, as a masking agent being used to cover up the scent of alcohol. *State v. Bell*, No. 106,360, 2012 WL 4372999 (Kan. App. 2012) (unpublished opinion). Here, the officer testified that based on his experience, cologne is often used to mask the odor of illegal drugs. But the officer did not have surrounding circumstances similar to the officer in *Bell* that indicated that the cologne was being used to mask any odor. Further, the officer only briefly saw the bottle of cologne and did not testify that he smelled it. Thus, there is no indication that the odor of the cologne, the very property which makes it suspect, was present. Without the odor

17

of the cologne being employed and absent other circumstances similar to those in *Bell*, the cologne does not weigh heavily on the probable cause determination.

The trial court also considered the fact that Miles' rental car was past due as a circumstance that weighed in favor of finding probable cause. This finding is directly refuted by the officer's own testimony. After Miles provided the officer with the paperwork relating to the rental, the officer noticed that the paperwork indicated that the car was past due. Miles explained that the paperwork was wrong and told the officer the date that he was told to return the car. The officer testified that he accepted Miles' explanation because the officer had experienced similar situations with rental cars. Also, when the officer ran the information on the car, it came back unremarkable. It is obvious from the officer's testimony that he did not use the past due rental agreement in developing probable cause to search Miles' car. As a result, the trial court's use of the same fact to support a probable cause determination is not supported by substantial competent evidence.

The trial court noted that the main factor weighing in favor of its finding of probable cause was the officer's belief that he had seen marijuana crumbs on the passenger seat of Miles' car. The trial court specifically stated that "the probable cause issue revolve[d] around the visual observations in *plain view* of the marijuana buds, for what the officer believed to be marijuana buds in the car at that time." (Emphasis added.) Thus, whether probable cause existed under the automobile exception directly hinges on whether the search was justified by the plain view exception. For this reason, it is necessary to turn our inquiry to the plain view exception.

The plain view exception requires three things: (1) an officer must be in a lawful position to view the object; (2) the incriminating character of the item must be immediately apparent; and (3) the officer must have a lawful right to access the item. *Horton v. California*, 496 U.S. 128, 136-37, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990).

18

The plain view doctrine does not justify seizure of an item when "the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object." *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993). An extension of the plain view exception recognized by our Supreme Court is the plain feel exception. *State v. Wonders*, 263 Kan. 582, 592, 952 P.2d 1351 (1998). As adopted, the plain feel exception operates the same as the plain view exception, only replacing an officer's sense of sight with an officer's sense of touch. See *Dickerson*, 508 U.S at 375-76. Our Supreme Court also recognizes that the plain smell of marijuana in a vehicle provides an officer with particularized suspicion of criminal activity and gives the officer probable cause to search the vehicle. *State v. MacDonald*, 253 Kan. 320, 325, 856 P.2d 116 (1993).

Miles argues that the officer's "seizure of the alleged green flaky substance cannot be justified because he was not lawfully in a position to view the substance, the incriminating character was not immediately apparent, and he did not have a lawful right to access the substance in the car."

Miles first argues that he "had not committed any traffic infraction and [the officer's] search was based solely on the alleged traffic infraction." Thus, Miles argues that the officer was not in a lawful position to view the alleged marijuana crumbs because the traffic stop was illegal. As was previously determined, the officer had sufficient reasonable suspicion to stop Miles' vehicle. Moreover, the officer viewed the alleged marijuana crumbs when he first approached Miles' vehicle. Therefore, the officer viewed the alleged marijuana crumbs from a lawful position. Thus, Miles' argument fails.

Next, Miles argues that the officer "could not tell whether the substance was incriminating in nature without picking it up, looking at it and rubbing it between his fingers." In arguing this point, Miles argues that the incriminating nature of the item was

19

not immediately apparent. We draw guidance from a United States Supreme Court decision concerning plain view.

In *Arizona v. Hicks*, 480 U.S. 321, 324-25, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987), the Court held that a seizure of stolen stereo equipment was invalid under the plain view doctrine because even though the police were lawfully serving a search warrant on the premises, they could not identify the equipment as contraband until they moved it to read its serial numbers.

In the video, the officer initially stated that he saw what "appeared" to be marijuana, indicating that he was not sure of the actual identity of the substance. The officer eventually retrieved the alleged marijuana from the seat and manipulated it between his fingers. Even after manipulating the object and feeling it, the officer stated that he was not sure if it was marijuana. See *Wonders*, 263 Kan. at 592 (recognizing the plain feel exception to the warrant requirement). Thus, the officer failed to identify the incriminating nature of the object using his plain feel. He then allowed the marijuana to flake away into the air, without preserving it for further inspection.

The officer's actions here were both similar and dissimilar than the officers' actions in *Hicks*. Like *Hicks*, the officer was unable to identify the incriminating nature of the object without moving it. Unlike *Hicks*, though, the officer here was not successful in identifying the incriminating nature of the object even after moving it. Thus, where the court found that the incriminating nature of the stereo equipment in *Hicks* was not immediately apparent until the officers moved the stereo equipment to read its serial numbers, the incriminating nature of the alleged marijuana crumbs on the passenger seat of Miles' car were never immediately apparent even after the officer viewed and manipulated the alleged marijuana.

20

Moreover, Kansas recognizes that the plain smell of marijuana in a vehicle is sufficient to establish probable cause to search the vehicle. See *MacDonald*, 253 Kan. at 325. As was discussed earlier, the trial court and the officer focused on the presence of air fresheners in Miles' vehicle as an indicator that he was attempting to mask the smell of an illegal substance. Yet, when the officer removed the alleged marijuana crumb from the car and away from the odor of the air fresheners, he was still unable to use his sense of smell to identify the incriminating nature of the item. Thus, the officer failed to identify the incriminating nature of the alleged marijuana crumb using three of his senses—sight, touch, and smell—which are all tied to exceptions to the warrant requirement recognized in Kansas. For those reasons, the officer did not establish probable cause to search Miles' car under the plain view, plain feel, or plain smell exceptions to the warrant requirement.

Here, the officer testified that he believed he had established probable cause as soon as he saw the alleged marijuana on the passenger seat of Miles' car. But the officer's testimony was contradicted by the objective evidence presented in his body camera video. An officer's state of mind, except for the facts he or she *knows*, is irrelevant to the existence of probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004). Thus, the officer's subjective belief that he had established probable cause has no influence on this court's determination of whether probable cause existed. Instead, we must look to the facts that he *knew* when the stop occurred. *Devenpeck*, 543 U.S. at 153.

For instance, the officer admitted that he did not have consent to search the car when he retrieved the alleged marijuana crumb from the passenger seat of the car. The trial court, however, did not consider this fact in making its probable cause determination. Still, the fact that the officer was not sure of the identity of the substance even after manipulating it with his hands speaks to whether he was able to adequately identify the substance initially. The officer testified that he was trying to put Miles at ease and build probable cause. Yet, when the officer's backup arrived after he had already seen and

21

manipulated the alleged marijuana, he told the other officers that he was not sure if the substance on the passenger seat was actually marijuana. For this reason, he asked Miles for consent to search his car. Certainly, talking to the other officers about his own doubts would not have had any effect on keeping Miles' behavior calm. Keeping these facts in mind, we turn our focus on the facts again that were *known* to the officer when he claimed to have established probable cause. The record shows that the officer did not *know* that the object on the passenger seat of Miles' vehicle was in fact marijuana. Thus, even with the officer's testimony that he was trained to know what marijuana looked like, it is clear that based on the facts known to him when the car stop occurred, he did not immediately recognize the substance on Miles' passenger seat as marijuana. Indeed, it would be disingenuous to say, at the very least, that facts are "known" to the officer if he or she *has doubts about* those "facts."

In conclusion, based on the totality of the circumstances and the record on appeal, no probable cause existed to search Miles' vehicle. This court is not to reweigh evidence or reassess the credibility of witnesses, but this court can determine whether the trial court's findings are based on substantial competent evidence. *Patterson*, 304 Kan. at 274. Here, the trial court's determination that probable cause existed based on the air fresheners, the cologne, and the alleged marijuana crumbs on the front passenger seat lacked substantial competent evidence in the record. Further, the trial court was incorrect in finding that probable cause existed based on the officer's plain view of the substance on Miles' passenger seat. Contrary to the trial court's findings, the incriminating character of the substance on Miles' passenger seat was not immediately apparent to the officer even after examining it with his senses of sight, touch, and smell. For those reasons, the officer did not have probable cause to search Miles' car under the automobile exception or the plain view exception.

*Did Miles Provide a Valid Consent for the Officer to Search His Vehicle?*

The Fourth Amendment to the United States Constitution protects citizens against unreasonable searches and seizures. Thus, the touchstone of the Fourth Amendment is reasonableness. *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996).

After a legal traffic stop is initiated, a law enforcement officer may normally request a driver's license and registration, conduct a computer check, and issue a citation. *State v. Spagnola*, 295 Kan. 1098, 1104, 289 P.3d 68 (2012). Once the driver has produced documentation sufficient to prove he or she is entitled to drive the vehicle, the driver is entitled to proceed on his or her way without further delay or additional questioning. *Spagnola*, 295 Kan. at 1104. If a detention is prolonged beyond the time reasonably required to issue the ticket for which the driver was originally stopped, the stop can become unlawful. *Spagnola*, 295 Kan. at 1104 (citing *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 [2005]). The length of a traffic stop may be extended "if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or if the driver voluntarily consents to further questioning. [Citations omitted.]" *Spagnola*, 295 Kan. at 1105. The investigating officer should employ "the *least intrusive means reasonably available* to verify or dispel the officer's suspicion in a short period of time." (Emphasis added.) *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983).

Here, the officer had reasonable suspicion to believe a traffic infraction had occurred. The officer effected a lawful stop of Miles' car. When the officer asked Miles why he had moved into the other lane, Miles told the officer that he was washing his windshield and could not see. After the officer obtained Miles' documentation, he told Miles that if everything checked out, he would likely give him a verbal warning. The officer then went to his patrol car to run a computer check. The officer stated in the body

camera video that he had seen what appeared to be marijuana on Miles' passenger seat. The computer check did not turn up any issues, and the officer did not write Miles a citation at that time. Instead, the officer went back to the car and initiated the events which extended the stop after seeing the alleged marijuana. Thus, the officer prolonged the stop past the time required to issue the citation that initially justified the stop. While the officer did not have probable cause at that time, he did have an objectively reasonable suspicion based on the alleged marijuana crumbs to extend the stop.

Where the officer's conduct fell short was in his failure to use the least intrusive means available to verify or dispel the officer's suspicion that Miles had marijuana in the car. See *Royer*, 460 U.S. at 500. As previously discussed, the officer did not have probable cause immediately upon seeing the alleged marijuana because its incriminating nature was not immediately apparent to him. This brings us back to the fact that the officer had a trained drug dog in the back seat of his patrol car for the entirety of the stop. The least intrusive method of investigation that the officer could have used would have been to take the drug dog out of the patrol car and to have the dog walk around the exterior of Miles' car. This would not have even been a search for the purpose of the Fourth Amendment to the United States Constitution. *Caballes*, 543 U.S. at 410. If the dog would have been used, a negative result would have freed Miles in a short period of time, and a positive result would have justified his arrest and a more extensive search based on probable cause. See *Royer*, 460 U.S. at 506. Instead, the officer reached into Miles' car without his consent to search and picked up a small piece of what he believed to be marijuana. A search conducted without a warrant and not justified by any exceptions to the warrant requirement is per se unreasonable. *State v. Thompson*, 284 Kan. 763, Syl. ¶ 11, 166 P.3d 1015 (2007). Thus, the officer conducted an illegal search of Miles' car because, as previously determined, it was not supported by probable cause, and the officer admitted that he did not have Miles' consent.

24

Even so, not all evidence is "fruit of the poisonous tree" simply because it would not have been discovered but for an officer's illegal actions. *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). "Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' [Citation omitted.]" *Wong Sun,* 371 U.S. at 488. A primary taint can be purged by an individual providing voluntary consent to search. *Thompson*, 284 Kan. at 777.

For consent to search to be valid, there must be clear testimony that the consent was freely given, and the consent must have been given without any express or implied coercion or duress. *Thompson*, 284 Kan. at 776.

> "Because this determination is fact-driven, no list of factors can be exhaustive or exclusive. Some factors occur frequently, including the following ones that tend to establish that an encounter was consensual: knowledge of the right to refuse, a clear communication that the driver is free to terminate the encounter or refuse to answer questions, return of the driver's license and other documents, and a physical disengagement before further questioning." *Thompson*, 284 Kan. at 811.

The court may also consider the words used by the officer requesting consent. *State v. Hogan*, 45 Kan. App. 2d 715, 722, 252 P.3d 627 (2011). No single factor is dispositive in considering the totality of the circumstances. *Thompson*, 284 Kan. 763, Syl. ¶ 20.

> "[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 93 S.Ct. 2041, 36 L. Ed. 2d 854 (1973).

25

Miles argues that the officer's action of reaching into his car to retrieve the marijuana crumb was a demonstration of authority that amounted to "subterfuge" which rendered his consent invalid.

The officer admitted at trial that he did not have consent to search Miles' car when he reached into the car and retrieved the object he believed to be marijuana. The officer told Miles that he could not tell whether the object was marijuana. Immediately after the nonconsensual retrieval of the alleged marijuana, the officer approached Miles and asked for his consent to search the entire car. When he asked for Miles' consent, the officer told Miles the following: "You don't have to say yes, you absolutely have the right to say no. But is it alright if I search the car real quick to make sure that that's not weed that I'm looking at?"

The officer oddly phrased his question in a negative, asking if he could search the vehicle "to make sure that that's *not* weed . . . ." (Emphasis added.) To the same point, the trial court noted that the officer had made "a number of other statements" that clearly demonstrated that "the officer was in fact lying or attempting to not fully tell the truth or misdirect the defendant." The fact that the officer told Miles of his right to refuse to give his consent does weigh in favor of finding that Miles provided voluntary consent. Still, the true question is whether the totality of the circumstances showed that Miles' consent was voluntary and the taint of the officer's previous illegal search was purged.

Here, even though the officer told Miles that he had the right to refuse, it cannot be said that the primary taint was purged. The officer removed Miles from his car and directed him to stand behind his patrol car. The emergency lights on the officer's patrol car were engaged. The officer then went into Miles' car without consent or probable cause and retrieved the alleged marijuana crumb from the passenger seat. The officer told Miles that he could not tell whether the object was marijuana. The officer let that alleged piece of marijuana crumble between his fingers. Immediately afterwards the officer asked

26

for Miles' consent to search the entire car. The officer did not tell Miles that he was free to go nor did the officer physically disengage with Miles. As a result, the taint was never dissipated. Thus, based on the totality of the circumstances, and with special consideration given to the officer's previous conduct in entering Miles' car without consent, Miles' purported consent was not without coercion or duress.

Moreover, "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548-49, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968).

Here, the officer made an obvious show of authority when he entered Miles' car without consent and retrieved the alleged crumb of marijuana. The officer testified that he believed that he had probable cause to search the car as soon as he saw the alleged marijuana. The trial court pointed out in its ruling that Miles had failed to object to the search or withdraw his consent after the officer began the search. The weight the trial court places on Miles' failure to object to the search is misguided in light of the previously stated principle from *Bumper*. It is further misguided based on the fact that Miles was behind a patrol car for the majority of the time the search was conducted. It has been determined that the officer did not have probable cause to search Miles' car during the stop. The State can rely only on Miles' consent if it shows that it was freely and voluntarily given and not just an acquiescence to a claim of lawful authority. The State has failed to make such a showing. Based on the officer's actions of entering Miles' vehicle without consent to search, the State has failed to show that the subsequent consent was not merely an acquiescence to the officer's claim of lawful authority.

For those reasons, the trial court erred in finding that Miles had provided the officer with valid, voluntary consent to search his car.

27

Affirmed in part, reversed in part, and remanded with directions to grant Miles' motion to suppress all the seized evidence gathered as a result of the search of his car.

\*\*\*

MALONE, C.J., concurring: I concur in the result.